**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**SOUTHERN DIVISION AT LONDON**

| | |
|---|---|
| TAMMY WEBB, *Administratix of the Estate of* Terri Beth Mays, | CIVIL ACTION NO. 6:23-188-KKC |
| **Plaintiff,** | |
| v. | **OPINION and ORDER** |
| WHITLEY COUNTY, KENTUCKY, et al., | |
| **Defendants.** | |

\*\*\* \*\*\* \*\*\*

This matter is before the Court upon three motions for summary judgment (R. 39, 56, 60). The motions have been fully briefed and are therefore ripe for review. For the following reasons, the Defendants' motions for summary judgment (R. 39, 56, 60) are **GRANTED in part** and **DENIED in part**.

## I.   BACKGROUND

Terri Beth Mays died on November 4, 2021, while she was an inmate at the Whitley County Detention Center ("WCDC" or "Jail"). (*See generally* R. 74.) Her Estate ("Mays' Estate") alleges that Jail personnel, nurses, and medical providers were responsible for ensuring her health and safety while she was in their custody, yet they failed to address her obviously serious medical needs and acted with deliberate indifference to those needs. (R. 1 at 4.)

Mays' Estate brings the following causes of action against the Defendants: under 42 U.S.C. § 1983, deliberate indifference resulting in cruel and unusual punishment and denial of due process in violation of the Eighth, Tenth and Fourteenth Amendments (Count I); and under Kentucky state law, negligence and gross negligence (Count II); wrongful death (Count III); outrage and intentional infliction of emotional distress (Count IV); and vicarious liability

and *respondeat superior* (Counts V and VI). Mays' Estate seeks actual damages, punitive damages, interest, costs, attorney's fees, and a jury trial. (*Id.* at 24.)

Mays' Estate named as defendants Whitley County; Jailer Brian Lawson; Sergeants Austin Caldwell and Joseph Cureton; Deputy Jailers Sula Bowman, Kaytee George, Zach Hughes, and Nick Huddleston; Southern Health Partners, Inc. ("SHP"), and three of its nurses: Rojetta Bowling, Tammi Hounshell, and Karen Baker. (*Id.* at 1.) Webb also listed Unknown Individual Defendants 1–3 and Unknown Entity Defendants 1–3. (*Id.*) The Complaint names all individual defendants in both their official and individual capacities. (*Id.*)

The Defendants are represented in three groups. Each group filed a motion for summary judgment on all counts. (*See* R. 39, 56, 60.) For purposes of this Order, the Court refers to all Defendants collectively as "the Defendants." When necessary, Whitley County and the Jail employees are referred to as "the WCDC Defendants," and SHP and its nurses are referred to as "the SHP Defendants." Because this case involves more than a dozen parties, it is helpful to briefly identify them before turning to the relevant events.

### A.  Relevant Parties

***Administratix Tammy Webb:*** Webb is Mays' mother. (R. 1 at 5.) On February 13, 2023, Webb was appointed as administratix of Mays' Estate. (*Id.*) Webb, acting on behalf of Mays' Estate, sued many of the entities and individuals involved in the events leading up to Mays' death.

***Decedent Terri Beth Mays:*** Mays was a 34-year-old mother of three. (R. 74 at 1.) Mays was no stranger to the Jail, as she had been incarcerated there multiple times over the five-year period leading up to her death. (*Id.* at 2, 55.) Many WCDC personnel, including deputies, contract nurses, and other medical providers were familiar with her and with her medical history.  (*Id.* at 37.)

2

At or about the time of her death, Mays was suffering from multiple serious health conditions. She had a long history of drug abuse, which began when she was a preteen. (R. 60-1 at 3.) As recently as October 28, 2021, the day she was taken into custody, she had used heroin and was experiencing withdrawal symptoms. (R. 74 at 7.) At an earlier doctor's appointment in 2020, Mays "confessed to using Klonopin and heroin and told the doctors that she consumed a large quantity of illicit drugs on a daily basis." (R. 60-1 at 3.)

In addition to her crippling drug use, Mays also suffered from a seizure disorder. (R. 74 at 7.) She regulated her disorder by taking Dilantin 100mg twice a day. (*Id.* at 9.) On the day she was admitted to the Jail, however, Mays could not identify the prescribing physician or the pharmacy that filled her seizure medication, but her medical records from a previous 2020 incarceration at the Jail documented that she had been prescribed Dilantin. (*Id.* at 11.)

***Defendant Whitley County, Kentucky***: Whitley County, by way of its Fiscal Court, is the governmental entity that funds and approves policy for the Jail. (R. 74 at 45.) The Fiscal Court provides financially for the Jail and is the final policymaker for budget allocations. (*Id.*) Notably, the Fiscal Court approves the Jail's healthcare contracts. (*Id.*) The Fiscal Court was primarily responsible for approving the health-care provider contract which staffed nurses in the Jail 12 hours a day, seven days a week. (*Id.*)

***Defendant Brian Lawson:*** Lawson was the Whitley County Jailer at the time of Mays' death. Jailer Lawson oversaw WCDC operations, as well as ensuring the deputies received training required by the Kentucky Department of Corrections. (R. 60-1 at 8.) Jailer Lawson was a decision-maker who approved healthcare provider staffing 12 hours a day, seven days a week. (R. 74 at 6.) Jailer Lawson was not present at the Jail during the time of Mays' death. (R. 60-1 at 9.)

***Defendant Kaytee George:*** George was a deputy jailer at the WCDC and was directly involved in multiple critical incidents involving Mays. (R. 74 at 61.) During Mays' 2021 incarceration, Deputy George responded to Mays' November 2 medical episode, witnessed her fall in the shower on November 3, and found her in critical condition on November 4, the morning of her death. (*Id.* at 61–64.)

***Defendant Sula Bowman:*** Bowman was a deputy jailer at the WCDC who was directly involved in the events during the final hours of Mays' life. (R. 74 at 58.) Deputy Bowman was a certified paramedic and EMT who possessed specific expertise to recognize and respond to medical emergencies, including seizures. (*Id.* at 59.) Deputy Bowman was responsible for floor checks and observations. (R. 56-1 at 7.) Notably, Deputy Bowman checked on Mays from the evening hours of November 3 through the morning hours of November 4. (*Id.*) Bowman's last check on Mays was at 5:47 a.m. on November 4 when she brought Mays breakfast. (*Id.*) Bowman's shift ended at 7:00 a.m. that morning. (*Id.* at 8.)

***Defendant Austin Caldwell:*** Caldwell was a sergeant at the WCDC and was the "officer in charge." (R. 74 at 64.) Sergeant Caldwell was physically present during Mays' November 2 medical episode and was the one who made the decision to have her moved to an individual cell. (*Id.* at 65.) Sergeant Caldwell was not present during the morning of November 4, the day Mays died. (R. 60-1 at 9.)

***Defendant Joseph Cureton:*** Cureton was a sergeant at the WCDC who was present and during multiple days of Mays' stay at the Jail. (R. 74 at 68.) Sergeant Cureton was involved in the November 2 incident in which the decision was made to move Mays from cell 204 to 205. (*Id.*) Sergeant Cureton was also working on November 4, when Deputy Bowman informed him that something was wrong with Mays and that he needed to call the nurse. (*Id.* at 69.)

***Defendant Zach Hughes:*** Hughes was a deputy jailer at the WCDC who was directly involved in the November 2 incident where Mays was moved from cell 204 to 205. (R. 74 at 66.) Deputy Hughes was not present on the morning of Mays' death. (R. 60-1 at 11.)

***Defendant Nick Huddleston:*** Huddleston was a deputy jailer at the WCDC who was also present during the November 2 incident where Mays was moved from cell 204 to 205. (R. 74 at 70.) Deputy Huddleston was not on shift during the morning hours of Mays' death. (R. 60-1 at 12.)

***Defendant Southern Health Partners, Inc.:*** SHP is a company that provides medical care services to WCDC. (R. 39-1 at 2.) SHP was contractually obligated to provide 84 hours of on-site medical care at the WCDC, specifically, 12 hours per day seven days per week. (R. 74 at 5.) SHP offered on-call services during the hours that nurses were not on-site. (*Id.*) SHP employs the three nurses named as defendants in this suit.

***Defendant Rojetta Bowling:*** Bowling is a Licensed Practical Nurse ("LPN") employed by SHP. (R. 74 at 75.) Nurse Bowling was working at the Jail during Mays' stay. Specifically, Bowling was the nurse on duty who responded to Mays' medical emergency on the morning of November 4. (*Id.*) Nurse Bowling attempted to resuscitate Mays after she was found unresponsive in her cell. (*Id.*)

***Defendant Tammi Hounshell:*** Hounshell is an LPN employed by SHP. (R. 74 at 9.) Nurse Hounshell served as the initial medical professional responsible for evaluating Mays during her intake on October 30, 2021. (*Id.* at 71.) As an LPN, Hounshell's limited responsibility was to assess her patient, take vital signs, and document the medical records for the SHP provider, who, in this case, was Nurse Practitioner Karen Bennett-Baker. (*Id.* at 9.) Nurse Hounshell did not work at the Jail between November 1 and November 4. (R. 60-1 at 14.)

5

***Defendant Karen Bennett-Baker:*** Baker is a Nurse Practitioner employed by SHP. (R. 74 at 72.) Nurse Baker oversaw Mays' medical management at the Jail. (*Id.*) As SHP's provider, Nurse Baker was responsible for making diagnoses, formulating a treatment plan, and prescribing medications. (*Id.* at 9.) Specifically, it was Nurse Baker's job to review the intake form and make the decision whether to prescribe Mays with seizure medication. (R. 74 at 72.)

### B. Facts

Several key events occurred at the Jail in the period leading up to Mays' death. To provide a clear understanding of what happened and when, the following section presents the events in chronological order.

***April 19, 2021, Indictment for Drug Offenses:*** Mays was indicted on April 19, 2021, for trafficking heroin, possession of controlled substances, and possession of drug paraphernalia. (R. 60-1 at 4.)  Mays was not arrested until October 28, 2021. (*Id.*)

***October 28, 2021, Booking Intake and Medical Screening:*** At 9:37 p.m. on October 28, Mays was booked into the WCDC following her arrest. (R. 74 at 6.) During intake, a WCDC Deputy conducted a standard medical screening in which Mays completed a "Standard Medical Questions Form." (*Id.*; R. 60-1 at 4.) Mays informed the Deputy that she had a seizure disorder, Hepatitis C, recent drug use, withdrawal, and signs of physical abuse. (R. 74 at 7.) Specifically, Mays noted that she had ingested 1 gram of heroin two hours before arrival at WCDC. (R. 60-1 at 4.)

During the intake, Mays acknowledged that she was prescribed Dilantin for her seizures. (R. 74 at 7.) She signed a medical authorization that allowed WCDC staff to obtain her medical records. (*Id.*) Mays agreed to be treated by the Jail's medical staff. (*Id.*)

***October 30, 2021, SHP Medical Assessment:*** On October 30, Nurse Hounshell performed a routine medical assessment on Mays. (R. 74 at 8.) During the assessment Mays

reported that she was taking Dilantin 100mg twice daily for her seizure disorder. (*Id.*) Unfortunately, Mays could not remember the name of her prescribing doctor or the pharmacy where the medication was filled. (*Id.*) Nurse Hounshell was unable to obtain Mays' current medication list and was therefore unable to verify her Dilantin prescription. (*Id.* at 9.) She further documented that Mays complained of other problems including balance issues, dizziness, blackouts, headaches, and vomiting. (*Id.*) She also documented that Mays appeared to be under the influence of, or withdrawing from, drugs or alcohol. (*Id.* at 10.) After reviewing Mays' prior medical records, Nurse Hounshell found that Mays was previously prescribed Dilantin during an earlier incarceration and relayed this information to the SHP provider, Nurse Baker. (*Id.*)

Given the information obtained from the assessment, Nurse Hounshell initiated withdrawal monitoring and detox protocol for Mays, as ordered by Nurse Baker. (*Id.*) The usual withdrawal protocol medications were prescribed for nausea, vomiting, and diarrhea; however, Nurse Baker did not make an order for Dilantin, as she requested a current medication list before prescribing it again. (R. 60-1 at 14.) That same day, Nurse Baker initialed the bottom of the medical record showing that she had reviewed Nurse Hounshell's assessment. (R. 74 at 10.) Nurse Hounshell also recommended Mays be placed in general population housing with no restrictions. (R. 85 at 11.)

***October 31, 2021, Continued Evaluations:*** Mays continued to be monitored for detox symptoms on October 31. (R. 60-1 at 14.) Nurse Hounshell checked her vitals and noted that Mays complained of nausea, vomiting, weakness, sweatiness, shaking, and dehydration. (*Id.*) Accordingly, Nurse Hounshell administered the detox medications as previously ordered. (*Id.*) Between October 31 and November 1, Mays was placed in cell 204 with approximately 5 to 6 other women. (R. 74 at 12.)

7

*__November 1, 2021, Suspicious Seizure Incident:__* At approximately 7:30 a.m. on November 1, Nurse Bowling began making her morning medication pass rounds, accompanied by Deputy George. (R. 74 at 13.) Upon entering cell 204, Nurse Bowling observed Mays fall to the floor and saw her body begin jerking in a seizure-like manner. (*Id.*) Nurse Bowling retrieved an ammonia capsule in hopes to bring Mays out of her seizure, but before she could administer it, Mays said, "please don't do that because it will smother me." (*Id.* at 14.) Nurse Bowling also stated that when she walked back outside the cell, she overheard Mays tell the other inmates that, "if I keep doing this, they might let me out." (*Id.*)

This event was not reported to the WCDC deputies or to SHP. (*Id.*) No incident report was prepared, but the event was recorded in Nurse Bowling's notes. (*Id.;* R. 60-1 at 4.) That evening, Mays apologized to Nurse Bowling stating, "I am sorry for faking seizures. I just want to get out of here." (*Id.*)

*__November 2, 2021, Seizure Incident Prompts Relocation to Cell 205:__* On November 2, Nurse Bowling documented that Mays was weak, sweaty, shaky, restless, and nauseous. (R. 74 at 14.) At this time, Mays was still housed in cell 204 with 5 to 6 other women. (*Id.* at 15.) One of her cellmates, Alisha McElfrish, testified that Mays' condition was deteriorating and that she was having seizures and vomiting non-stop. (*Id.*) According to McElfrish, Mays was having 3 to 4 seizures per day. (*Id.*)

At approximately 10:30 p.m., McElfrish began banging on the cell door and yelled for the deputies to come help. (*Id.* at 16.) Deputies George, Caldwell, Cureton, Hughes, and Huddleson responded. (*Id.*) McElfrish told the deputies that Mays was, "laying on the floor, seizing out." (*Id.*) Per WCDC policy, female deputies handle female inmates. (R. 60-1 at 12.) Accordingly, the male deputies stood outside as Deputy George handled the situation. (*Id.*) Sergeant Caldwell saw Mays lying on the floor, speaking clearly and normally. (R. 85 at 10.)

8

As a precaution, Sergeant Caldwell made the decision to move Mays from cell 204 to 205, a special observation cell, where she could be closely monitored. (*Id.*) Afterwards, Deputy George provided an incident report for this event noting that Mays was weak and needed help getting off the floor. (R. 74 at 16.)

*November 3, 2021, Mays Falls in the Shower:* At approximately 11:30 a.m. on November 3, Deputy George gave Mays permission to shower in cell 206. (R. 74 at 19.) George escorted Mays to shower cell 206 and returned to check on her five minutes later. (*Id.*) When Geroge entered the cell, she witnessed Mays fall forward towards the door. (*Id.*) Mays remained conscious the entire time. (*Id.*) Deputy George prepared both a medical report and an incident report and ensured that SHP followed up appropriately. (*Id.*) Although she was not exactly sure, Deputy Geroge stated that a medical evaluation was conducted at 12:48 p.m. (*Id.*)

Following the shower fall incident, WCDC records reflect that deputies observed Mays' cell that day at 12:13 p.m., 3:29 p.m., and 4:15 p.m. (*Id.* at 24.) There were no reported observations between 4:15 p.m. on November 3 and 12:38 a.m. on November 4. (*Id.*)

At 11:00 p.m. on November 3, Deputy Bowman clocked into the Jail for her shift. (R. 74 at 25.) Her shift lasted from 11:00 p.m. on November 3 until 7:00 a.m. the next day. (*Id.*) It was her job to conduct observation rounds of the cells, including Mays' cell 205. (*Id.*)

*November 4, 2021, Mays Suffers a Medical Emergency and Dies:* During the early morning hours of November 4, Deputy Bowman recorded observations of Mays' cell 205 at 12:38 a.m., 1:32 a.m., 2:32 a.m., 3:51 a.m., 4:32 a.m., and 5:47 a.m. (*Id.*)

At the 1:32 a.m. observation, Deputy Bowman gave Mays a cup of water, as she could see that Mays was dehydrated and had been vomiting. (*Id.*) There was blood on Mays' foot and vomit on the floor. (*Id.* at 26.) After this visit, Deputy Bowman told her supervisor,

9

Sergeant Cureton, that something was wrong with Mays and that he needed to call a nurse or send her to the hospital. (*Id.*) Sergeant Cureton called Nurse Bowling who said that SHP couldn't send her out. (*Id.* at 27.)

Video recordings of Deputy Bowman's 2:32 a.m. and 3:51 a.m. observations show her walking past cell 205 without opening the cell door or looking into the cell. (*Id.*)

During the 4:32 a.m. check, Deputy Bowman opened the cell door and put her head inside for approximately 30 seconds. (*Id.*) She recalls seeing Mays awake, laying on her bunk, with her mouth drawn. (*Id.*)

At the 5:47 a.m. check-in, Deputy Bowman entered cell 205 to give Mays her breakfast. (*Id.* at 28.) Bowman observed that Mays did not seem normal, but she did not call 911 because that was her supervisor's job. (*Id.*) This was the last observation Deputy Bowman made. (*Id.*)

As Deputy Bowman clocked out at 7:00 a.m., she told the Jail's Finance Officer to inform her replacement, Deputy George, that something was wrong with Mays. (*Id.*) Deputy Bowman said that Deputy George needed to notify the nurse of Mays' condition when the nurse arrived. (*Id.*)

At 7:04 a.m., Mays suffered an extremely serious medical event. (*Id.*) During this seizure-like episode, video captured Mays attempt to stand, lose body control, and fall several times. (*Id.*) This medical episode lasted until 7:12 a.m. (*Id.*)

Mays was not attended to until eighteen minutes later at 7:30 a.m. when Deputy Geroge found Mays lying on the cell floor, unresponsive, with blood in her mouth, and barely breathing. (*Id.* at 29.) Deputy Geroge immediately ran to get medical help. (*Id.*)

Nurse Bowling arrived at Mays' cell at 7:38 a.m. (*Id.*) She documented that Mays was non-responsive and she was unable to measure Mays' vital signs. (*Id.*) Nurse Bowling also

administered an ammonia capsule under Mays' nose, with no success. (*Id.* at 29.) At 7:44 a.m., Deputy George brought over Narcan, and Nurse Bowling administered it to Mays. (*Id.*) At 7:46 a.m., Nurse Bowling called for emergency medical services. (*Id.*)

At 7:47 a.m. and 7:54 a.m. Nurse Bowling unsuccessfully attempted CPR on Mays, lasting only 8 and 20 seconds. (*Id.* at 30.) At 7:59 a.m., Nurse Bowling attempted to use an automated external defibrillator on Mays but placed the pads incorrectly. (*Id.*) Emergency Medical Services arrived at 8:01 a.m. and transferred Mays to Baptist Regional Medical Center in Corbin, Kentucky. (*Id.*) Mays was ultimately pronounced dead at 8:42 am. (*Id.*)

***February 1, 2021, The Medical Examiner's Report:*** The State Medical Examiner investigated the cause of Mays' death by conducting an autopsy. (R. 74 at 30.) During her autopsy, the Examiner found evidence of long-term drug abuse. (R. 60-1 at 2.) Toxicology testing revealed high levels of methamphetamines in Mays' cardiac blood. (*Id.*) Her urine sample was positive for gabapentin, methamphetamine and morphine. (*Id.*) Based on these findings, the Examiner concluded that Mays' primary cause of death was, "presumed cardiac dysrhythmia due to hypotonic dehydration associated with complications due to chronic drug abuse." (R. 74 at 30.) Mays' methamphetamine use was considered a contributory cause. (*Id.*) Notably, the Examiner found Mays' unspecified seizure disorder to be of "uncertain contribution," but the possibility of death due to a seizure could not be excluded. (*Id.*)

## II.  LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden and must identify "those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citation and quotation marks omitted). All evidence, facts, and inferences must be viewed in favor of the nonmoving

11

party. *See McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "In order to defeat a summary judgment motion, . . . [t]he nonmoving party must provide more than a scintilla of evidence," or, in other words, "sufficient evidence to permit a reasonable jury to find in that party's favor." *Van Gorder v. Grand Trunk W. R.R., Inc.*, 509 F.3d 265, 268 (6th Cir. 2007) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

## III.   ANALYSIS

The Defendants put forward the same general arguments in their motions for summary judgment. Primarily, the Defendants argue that Mays has not sufficiently established that any of the Defendants acted with deliberate indifference towards her and thus cannot be held liable for her constitutional claims. (R. 60 at 2.) Additionally, the Defendants argue that qualified immunity shields them from suit regarding the state law tort claims. (R. 60-1 at 26, 32, 28.)

### A.  42 U.S.C. § 1983 Deliberate Indifference Claim

42 U.S.C. § 1983 does not create substantive rights but merely provides remedies for deprivations of rights established elsewhere. *Flint ex rel. Flint v. Ky. Dep't of Corr.*, 270 F.3d 340, 351 (6th Cir. 2001). To prevail on a § 1983 claim, a plaintiff must prove "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Winkler v. Madison Cnty.*, 893 F.3d 877, 890 (6th Cir. 2018) (quoting *Shadrick v. Hopkins Cnty.,* 805 F.3d 724, 736 (6th Cir. 2015)) (internal quotation marks omitted). "Absent either element, a § 1983 claim will not lie." *Christy v. Randlett*, 932 F.2d 502, 504 (6th Cir. 1991).

The constitutional deprivation alleged here is that the Defendants deprived Mays of her life without due process of law in violation of the Eighth, Tenth, and Fourteenth Amendments of the U.S. Constitution because they were deliberately indifferent to her medical needs. (*See* R. 1 ¶ 95.) Mays' Estate asserts these claims against all defendants,

12

which includes both individuals and entities. Because § 1983 imposes liability under different standards for individual defendants and for governmental entities, the Court will address the claims against the individual defendants and then analyze the claims against the entity defendants thereafter. *See Mitchell v. McNeil, 487 F.3d 374*, 376 (6th Cir. 2007).

A plaintiff's incarceration status determines which constitutional amendment governs. Pretrial detainees have a right to medical care under the Fourteenth Amendment. *Hyman v. Lewis*, 27 F.4th 1233, 1237 (6th Cir. 2022). Mays was indicted on April 19, 2021. She was arrested pursuant to that indictment on October 28, 2021, and housed at the WCDC through November 4, 2021. There is no evidence in the record indicating that Mays had yet to plead guilty or face trial. Thus, she is properly classified as a pretrial detainee. Because Mays was undisputedly a pretrial detainee, her claims under the Eighth and Tenth Amendments must fail. Accordingly, the Defendants' motions for summary judgment are **GRANTED** for Mays' claims asserted under the Eighth and Tenth Amendments.

### i.   Defendants sued in their individual capacity

Mays sued the WCDC deputy jailers and SHP nurse defendants in their individual capacities. (*See* R. 1.) The Defendants argue that there is no proof that they acted with deliberate indifference. (R. 60 at 2, 39-1 at 5.) Without finding deliberate indifference, there is no Fourteenth Amendment violation, which means Mays' § 1983 claim would fail.

The Due Process Clause of the Fourteenth Amendment "forbids holding pretrial detainees in conditions that 'amount to punishment.'" *Kingsley v. Hendrickson*, 576 U.S. 389, 405, 135 S. Ct. 2466, 192 L. Ed. 2d 416 (2015) (quoting *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979)). Therefore, when a pretrial detainee asserts a claim related to medical treatment, the claim is analyzed under the Fourteenth Amendment. *Griffith v. Franklin Cnty.*, 975 F.3d 554, 566–67 (6th Cir. 2020) (citing *Winkler v. Madison Cnty.*, 893 F.3d 877, 890 (6th Cir. 2018)).

13

The Fourteenth Amendment deliberate indifference standard has both an objective and a subjective component. *Helphenstine v. Lewis Cnty., Kentucky*, 60 F.4th 305, 316–317 (6th Cir. 2023), *cert. denied*, 144 S. Ct. 692, 217 L. Ed. 2d 388 (2024). To make a deliberate indifference claim here, a plaintiff must demonstrate (1) an objectively serious medical need; and (2) that the defendants, analyzed individually, acted (or failed to act) intentionally and either ignored the serious medical need or "recklessly failed to act reasonably to mitigate the risk the serious medical need posed." *Grote v. Kenton Cnty.*, 85 F.4th 397, 405 (6th Cir. 2023) (quoting *Greene v. Crawford Cnty.*, 22 F.4th 593, 607 (6th Cir. 2022)).

### a.  Mays had an objectively serious medical need

Mays contends that the Defendants ignored her objectively serious medical need. (R. 74 at 36.) The WCDC defendants argue that they were not aware of a serious medical need until the morning of November 4, the day that Mays died. (R. 83 at 6.)

As to the objective component, obviousness is the key determination. *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897–899 (6th Cir. 2004). An objectively serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* at 897.

The uncontroverted evidence in the record establishes that Mays had an objectively serious medical need. Mays seizure disorder was known to WCDC deputies and SHP nurses. (R. 74 at 37.) She exhibited signs and symptoms of withdrawals and seizures such as dizziness, vomiting, headaches, blackouts and balance issues. (R. 74 at 8.) These symptoms were known by many of the deputy jailers, SHP nurses, and even her cellmate, McElfrish. (*See* R. 74 at 14–37.) Most of the WCDC deputies and McElfresh were laypersons with respect to understanding medical diagnoses, yet they all knew something was wrong with Mays. Accordingly, the Court finds that Mays had an objectively serious medical need.

### b. The WCDC Defendants did not recklessly fail to act reasonably to mitigate the risk the serious medical need posed

The Court will turn to the subjective component of Mays' claim, which is met when a defendant acts intentionally or recklessly in response to the need and risk it presented to the detainee. *Grote v. Kenton Cnty.*, 85 F.4th 397, 405 (6th Cir. 2023) (citing *Helphenstine*, 60 F.4th at 317). Mere medical negligence does not amount to a constitutional violation. *Brawner v. Scott Cnty.*, 14 F.4th 585, 596 (6th Cir. 2021). Even in cases where prison officials "actually knew of a substantial risk to inmate health or safety[, they] may be found free from liability if they reasonably respond to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). As an added safeguard, the Sixth Circuit has held that "a non-medically trained officer does not act with deliberate indifference to an inmate's medical needs when he 'reasonably defer[s] to the medical professionals' opinions.'" *McGaw v. Sevier Cty.*, 715 F. App'x 495, 498 (6th Cir. 2017) (quoting *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006)); *Winkler v. Madison Cty.*, 893 F.3d 877, 895 (6th Cir. 2018); *Spears v. Ruth*, 589 F.3d 249.

The Court "must address the subjective component for each officer individually." *Burwell v. City of Lansing, Mich.*, 7 F.4th 456, 466 (6th Cir. 2021). Because this inquiry is individualized, differently situated officers may be deliberately indifferent based on what they see, what they should have known, or their actions in response to a detainee's needs. *Greene*, 22 F.4th at 607–08. Accordingly, the Court will assess each defendant's conduct and state of mind separately in determining whether they acted with deliberate indifference.

### 1. Jailer Lawson

Mays' Estate alleges that Jailer Lawson was deliberately indifferent to Mays' medical needs by failing to supervise the deputies who were responsible for her care. To establish

15

supervisory liability, a plaintiff must establish that the supervisory official "encouraged the specific incident of misconduct or in some other way directly participated in it." *Phillips v. Roane Cnty.*, 534 F.3d 531, 543 (6th Cir. 2008) (citation and quotation marks omitted). Supervisory liability will only attach if the supervisor "at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Coley v. Lucas Cty.*, 799 F.3d 530, 542 (6th Cir. 2015) (citation and quotation marks omitted). A supervisor's negligence or recklessness is insufficient to impose liability. *See Does v. Whitmer*, 69 F.4th 300, 307 (6th Cir. 2023). The plaintiff must therefore point to a "specific action" of the supervisor that contributed to the constitutional violation. *See Phillips*, 534 F.3d at 544.

The record establishes that Jailer Brian Lawson "did not have firsthand knowledge of any of the incidents." (R. 60-1 at 9.) His awareness of the events came only after the fact, through review of the incident reports. (*Id.*) The record contains no evidence that Lawson directly participated in, encouraged, authorized, approved, or acquiesced in the medical treatment provided to Mays. Because Lawson was not present during the events preceding Mays's death, he could not have acted intentionally or recklessly in regard to Mays' medical needs. Therefore, to the extent Mays contends that Lawson bears supervisory liability under § 1983, that claim fails. Accordingly, summary judgment is **GRANTED** in favor of Jailer Lawson on this claim.

### 2. Deputy George

Deputy George was the deputy most involved with Mays. She moved Mays from cell 204 to 205, witnessed her fall in the shower, and was the first to respond to her cell on the morning of November 4, the day she died. (R. 74 at 61–64.) Mays' Estate's expert opines that Deputy George knew or should have known that Mays was experiencing a serious medical

16

condition, seizures and/or withdrawal or overdose, but failed to ensure she received appropriate medical care, and that George's repeated failures to initiate proper responses in the face of escalating distress amounted to deliberate indifference that contributed to Mays' death. (*Id.* at 64.) Deputy George responds that she was entitled to rely on the medical judgment of SHP nurses and that her actions, taken in accordance with their recommendations, were not deliberately indifferent. (R. 56-1 at 21.)

Deputy George's first interaction with Mays was on November 2, when Mays was having a seizure-like medical episode in cell 204. (R. 74 at 61.) Deputy George, the primary female deputy, helped moved Mays to cell 205, explaining that the move was for Mays' protection and to calm the other inmates. (*Id.* at 62; R. 56-1 at 11.) Mays' Estate faults Deputy George for not contacting medical staff after this episode. However, Deputy George testified that incident reports were routed to supervisors, who would notify medical as needed. (R. 56-1 at 11.)

On November 3, Deputy George allowed Mays to shower in cell 206 and saw her fall toward the door. (*Id.*) Mays remained conscious and was able to sit on the bench, and Deputy George immediately called for medical evaluation. (*Id.* at 12.)

On November 4, upon beginning her shift, Deputy George went directly to check on Mays, found her unresponsive, and ran to get medical help. (*Id.*) She returned with Nurse Bowling, assisted in checking Mays' pulse, performed CPR, and accompanied her to the hospital. (*Id.*)

Whether viewed collectively or individually, the evidence of Deputy George's conduct does not demonstrate that she recklessly failed to act reasonably to mitigate a known serious risk. After each apparent medical event, Deputy George either took protective steps (moving Mays to a single cell) or summoned medical staff. Her failure to separately report the November 2 incident to medical, while arguably improper, is not the kind of reckless

17

disregard the Fourteenth Amendment requires. Nor does the record suggest that Deputy George overrode or ignored medical advice; the decision to prescribe, withhold, or adjust medication rested with SHP nurses, not with the deputies. On this record, no reasonable jury could find that Deputy George recklessly failed to act reasonably to mitigate the risk posed by Mays' serious medical needs. Accordingly, Deputy George's motion for summary judgment is **GRANTED** with respect to the deliberate indifference claim.

### 3. Deputy Bowman

There is a factual dispute about whether Deputy Bowman was present for the November 2 incident. She testified that she helped move Mays from cell 204 to 205, but Mays' Estate notes that Sergeant Cureton recalled only himself and Deputy George assisting, and Deputy Bowman's name does not appear on the incident report. (R. 56-1 at 6, 11; R. 74 at 16.)

Even assuming Deputy Bowman was present, her limited involvement in helping move Mays to cell 205 does not amount to deliberate indifference. Mays' Estate argues that Deputy Bowman's "inaction" was especially egregious because, as an EMT, she had specialized training to recognize and respond to medical emergencies. (R. 74 at 59.) However, there is no evidence that Deputy Bowman failed to render aid to an active seizure episode. The record shows that Mays appeared weak, needed help getting off the floor, and had vomited, after which deputies assisted her and moved her to cell 205 "with no further incident." (R. 56-1 at 11; R. 74 at 16.) Given these facts, Deputy Bowman did not confront an obvious, ongoing medical crisis that she recklessly chose to ignore. Rather, she encountered an inmate who was awake, alert enough to be moved, and was relocated to an isolated cell for her own protection. If Deputy Bowman was not present for the November 2 incident, then her conduct at that time necessarily cannot be characterized as reckless.

Deputy Bowman's primary involvement stems from her shift on November 3 into the early hours of November 4, during which she performed multiple checks on Mays. Mays'

18

Estate contends that Bowman had "direct, firsthand confirmation of Mays's critical state" yet "deliberately and callously failed to intervene or summon medical help," thereby breaching her duty. (R. 74 at 60.) Mays' Estate takes issue with the fact that the WCDC Policy and Procedures require in-person observation of inmates in cell 205 every 20 minutes, yet during the morning hours of her death she was only checked in on five times. (*Id.* at 22, 60; *infra* § III.B.ii.a.)

The record, however, reflects that Deputy Bowman recognized Mays' declining condition and took several steps in response: she brought Mays water because she appeared dehydrated, informed her supervisor, Sergeant Cureton, and told him to contact medical staff; observed Mays sleeping, brought her breakfast, and relayed Mays' condition to the next deputy at shift change. (R. 56-1 at 7.)

Viewed as a whole and from Deputy Bowman's perspective at the time, this conduct does not show that she recklessly failed to act reasonably to mitigate the risk posed by Mays' serious medical needs. Deputy Bowman followed her chain of command, made repeated checks, and ensured continuity of monitoring between shifts. While she arguably could have done more, such as personally insisting on more frequent medical evaluations that properly aligned with the cell 205 observation policy, these omissions do not rise to the level of reckless disregard required under the Fourteenth Amendment standard. Because the evidence would not permit a reasonable jury to find that Deputy Bowman recklessly failed to act reasonably to mitigate the risk that Mays' serious medical condition posed, her motion for summary judgment is **GRANTED** with respect to this claim.

### 4. Sergeant Austin Caldwell

As the officer in charge, Sergeant Caldwell was the primary decisionmaker who moved Mays from cell 204 to 205. (R. 74 at 4.) Although Mays' Estate sharply criticizes the Deputies' handling of this incident, moving Mays from a crowded cell of five or six women to a special

19

observation cell was, on its face, a prudent step to protect her and allow closer monitoring. Mays' Estate further contends that Sergeant Caldwell's decision not to contact the on-call SHP nurse or EMS reflected "extreme recklessness and deliberate indifference to an unjustifiably high risk." (*Id*.)

The record, however, paints a far less troubling picture. Evidence indicates that Mays was alert when deputies reached her cell; although she was weak and had vomited, deputies were able to help her up and she moved to cell 205 under her own power. (R. 56-1 at 10–11.) These symptoms are consistent with severe drug withdrawal. (*See* R. 56-1 at 9 (noting Mays' withdrawal symptoms), and R. 74 at 53–54 (discussing the sign that deputies use to recognize symptoms).) Sergeant Caldwell, who had access to the intake and incident forms, knew that Mays had a seizure disorder but also that she was undergoing withdrawal, had ingested a large amount of illicit drugs shortly before booking, and had admitted to faking a seizure the day before.

Viewed from Sergeant Caldwell's perspective at the time, choosing to relocate Mays to a special observation cell where she could be more closely observed, without immediately summoning EMS or the on-call nurse, does not amount to recklessly failing to act reasonably to mitigate a known serious medical risk. While a more cautious deputy might have contacted SHP, that omission falls short of the heightened recklessness standard required for a deliberate indifference claim. Accordingly, Sergeant Caldwell's motion for summary judgment is **GRANTED** with respect to this claim.

### 5. Sergeant Joseph Cureton

Sergeant Cureton was listed as a witness for Mays' November 2 medical episode but had limited involvement. (R. 60-1 at 11.) Mays' Estate takes issue with the conflicting version of events presented by Deputy Bowman and Sergeant Cureton. Deputy Bowman claimed that during the November 2 medical incident, she and Sergeant Cureton both went inside Mays'

cell to retrieve her. (*Id.* at 58.) This contradicts Sergeant Cureton's testimony that he "never went into the cell." (*Id.* at 59.) Although this is a factual discrepancy, it is not a material one.

Sergeant Cureton was also working during the early morning hours of November 4, the day that Mays died. (R. 74 at 70.) He was partly responsible for monitoring Mays' cell on the cameras. (*Id.*) It was also during that time when Deputy Bowman told him to call a nurse or send Mays to the hospital. (*Id.* at 26.) Deputy Bowman testified that Sergeant Cureton called Nurse Bowling who informed him that SHP would not send her out. (*Id.*)

Even when construing the factual discrepancy in Mays' favor, Sergeant Cureton's actions on November 2 and November 4 do not amount to the high recklessness threshold needed to prevail on a deliberate indifference claim. First, there is simply no evidence that Sergeant Cureton ignored Mays' medical need. In fact, the evidence shows quite the opposite. On November 2, he responded alongside others to her medical episode. He assisted in moving her from an occupied cell with other inmates who were growing frustrated with her condition to an isolation cell was a reasonable accommodation. There is no evidence to suggest that these actions were reckless.

Similarly, on November 4, Sergeant Cureton called medical professionals when prompted by his deputy. (*Id.* at 69.) Whether or not making a phone call alone without more was considered a reasonable mitigation of the risk, he took action in response to learning of her medical need and validly relied on the medical judgment of Nurse Bowling and SHP. *McGaw*, 715 F. App'x at 498. This conduct is consistent with applicable caselaw and cannot be classified as reckless. Accordingly, Sergeant Cureton's motion for summary judgment is **GRANTED** with respect to this claim.

### 6.  Deputy Zach Hughes

Deputy Zach Huges had limited involvement regarding Mays' medical incidents. He was one of the many deputies who responded to the November 2 incident where Mays was moved from cell 204 to 205. (R. 60-1 at 10.) There is no evidence to suggest that he had any involvement in the decision-making process to move Mays, nor is there evidence that he did anything else other than respond to the scene. Hughes was also not present for the medical episode on the morning of Mays' death. Hughes' limited involvement does not amount to a cognizable claim here. Because no reasonable jury could construe Deputy Hughes' actions as intentional or reckless, his motion for summary judgment is **GRANTED** with respect to this claim.

### 7.  Deputy Nick Huddleston

Like Deputy Hughes, Deputy Huddleston had limited involvement with Mays. He was one of the many deputies who responded to the November 2 incident where Mays was moved from cell 204 to 205. (R. 60-1 at 12.) He does not remember seeing Mays when she was being moved, nor was he involved in monitoring her, per the WCDC policy requiring female inmates to be monitored by female staff. (*Id.*) Deputy Huddleston's limited involvement does not amount to a cognizable claim here. Because no reasonable jury could construe Deputy Huddleston's actions as intentional or reckless, his motion for summary judgment is **GRANTED** with respect to this claim.

### c.  SHP Defendants

In cases involving mistreatment by medical personnel, [the Sixth Circuit] has held that 'less flagrant conduct [than that of other government officials] may constitute deliberate indifference.'" *Phillips v. Roane Cnty., Tenn.*, 534 F.3d 531, 544 (6th Cir. 2008) (quoting

*Terrance*, 286 F.3d at 843).[1] In deciding whether a plaintiff's deliberate indifference claim against a medical professional may survive summary judgment, a court must ask whether a reasonable jury could find that a reasonable doctor or nurse in the defendant's position could have concluded that a substantial risk of serious harm to the plaintiff existed. *Terrance*, 286 F.3d at 844, 846. This means that medical professionals must not "consciously act[] unreasonably in response to [a] known risk." *Sours v. Big Sandy Reg'l Jail Auth.*, 593 F. App'x 478, 485 (6th Cir. 2014). In addition, "[g]rossly inadequate medical care may establish deliberate indifference." *Shadrick*, 805 F.3d at 744 (citing *Terrance*, 286 F.3d at 843).

In this case, a reasonable jury could find that Nurse Baker understood that a serious risk of harm to Mays existed, and that her response was "grossly inadequate." *Id*. To the contrary, there is insufficient evidence to show that nurses Hounshell and Bowling acted with deliberate indifference. Accordingly, for the reasons explained below, summary judgment is **DENIED** as to Nurse Baker and **GRANTED** in favor of nurses Hounshell and Bowling on this claim.

### 1.  Nurse Karen Baker

Nurse Baker was not personally involved in Mays' health episodes, but she bore primary responsibility for diagnosing, formulating a treatment plan, and prescribing medications. (R. 74 at 9.) Mays' Estate contends that "NP Bennett-Baker failed to properly assess and address Mrs. Mays's need for an anti-antiepileptic medication…Bennett-Baker's failure was a significant deviation in the standard of care and contributing cause of Mays's death." (*Id*. at 72.)

---

[1] Although the cases discussed in this section arise under the Eighth Amendment's deliberate indifference standard, the analysis remains the same. Because the Eighth Amendment imposes a higher threshold for proving deliberate indifference than the Fourteenth Amendment, conduct that satisfies the Eighth Amendment standard would necessarily also constitute deliberate indifference under the Fourteenth Amendment. *See Brawner,* 14 F4th at 596 (discussing how the new Fourteenth Amendment standard is less onerous than the Eight Amendment one.).

Medical providers may "not escape liability if the evidence showed that [they] merely refused to verify underlying facts that [they] strongly suspected to be true, or declined to confirm inferences of risk that [they] strongly suspected to exist." *Farmer v. Brennan*, 511 U.S. 825, 114 S. Ct. 1970 (1994).

The Sixth Circuit's decision in *Rouster v. County of Saginaw*, 749 F.3d 437 (6th Cir. 2014) is particularly instructive. In *Rouster*, an inmate died from a perforated ulcer. The court held that the defendant nurses were not deliberately indifferent because they reasonably believed the decedent was suffering from alcohol withdrawal and did not have knowledge of his ulcer or any other serious underlying ailment. *Id.* at 452–453. Finding one nurse not liable, the court said, "[the nurse's] conclusion that Jerry suffered from alcohol withdrawal was entirely reasonable. Rouster has presented no evidence that [the nurse] considered an alternative, more serious diagnosis but refused to verify that Jerry's symptoms were consistent with such a condition." *Id.*

Importantly, the Sixth Circuit discussed a counterfactual scenario that would rise to the level of deliberate indifference:

> Had they received full information regarding Jerry's medical history, we could easily conclude that [the nurses] were deliberately indifferent to Jerry's needs. *See Johnson v. Karnes*, 398 F.3d 868, 875-76 (6th Cir. 2005). However, "the standard is not whether there is something easy that the doctors, with the benefit of hindsight, could have done." *Williams v. Mehra*, 186 F.3d 685, 692 (6th Cir. 1999) (en banc). We must judge their actions based on the information that was available to them at the time.

*Id.* at 453.

The case law demonstrates a consistent pattern: when a nurse treats a patient displaying withdrawal symptoms without knowledge of other underlying medical conditions, such conduct often does not rise to deliberate indifference. However, when a nurse is aware of an inmate's more serious medical issue and merely refuses to verify or confirm risks, a

24

finding of deliberate indifference may be warranted. *See Rouster*, 749 F.3d 437, 452; *Farmer*, 511 U.S. at 843 n.8); *Johnson v. Karnes*, 398 F.3d 868, 875-76 (6th Cir. 2005).

The undisputed facts show that the medical record Nurse Baker reviewed and approved stated that Mays had a seizure disorder and had previously been prescribed Dilantin while at WCDC. (*Id.* at 10, 71.) Nurse Baker testified that it was her clinical judgment to not prescribe Dilantin because Mays could not identify the prescribing provider or pharmacy. (*Id.* at 73.) Instead of verifying Mays' updated prescription list, Nurse Baker chose to put Mays on withdrawal and detox protocol. After her October 30 medical evaluation, Mays went five days in custody without any seizure medication, during which she exhibited seizure-like symptoms and seizure-like events on numerous occasions. There is no evidence that, during this five-day period, Nurse Baker made any effort to verify the prior prescription through the jail, a pharmacy, or outside medical records. (*Id.* at 71–73.)

Unlike the nurses in *Rouster* who had no knowledge of the decedent's serious medical need, Nurse Baker knew of Mays' history of seizures and previous Dilantin prescriptions. (R. 74 at 10.) Mays' Estate has presented sufficient evidence that Nurse Baker had knowledge of Mays' more serious seizure diagnosis and refused to verify that Mays' symptoms were consistent with a seizure, rather than drug withdrawals. *Rouster*, 749 F.3d at 452–453.

Judging Nurse Baker's decision to rely on her "clinical judgment" instead of looking into Mays' prescription history when she had knowledge not only of her seizure issues but also her medical history is not improperly holding her to an unreasonable standard "with the benefit of hindsight." *Williams*, 186 F.3d at 692. Rather, the Court is judging Nurse Baker based on the information that was available to her at the time: Mays' medical and prescription history. *Rouster,* 749 F.3d at 453.

With this precedent in mind, a reasonable jury could "easily conclude" that Nurse Baker recklessly failed to act reasonably to mitigate the risk posed by Mays' known seizure disorder. *Id.* A jury could conclude that, in the face of documented seizure history, recent Dilantin use at the same jail, and emerging seizure-like symptoms, simply declining to medicate without taking even minimal steps to confirm or rule out the prior prescription constituted a reckless deviation from reasonable behavior. Because a jury could determine that Nurse Baker's inaction was a reckless disregard of a serious medical need, her motion for summary judgment on this claim is **DENIED**.

### 2.  Nurse Tammi Hounshell

Nurse Hounshell conducted Mays' routine medical assessment and had the limited role of assessing inmates and documenting information for the provider. (R. 74 at 9.) On October 30, she documented Mays' medical history and reported symptoms, recorded Mays' statement regarding current Dilantin use (though unable to verify it) and specifically noted Mays' 2020 Dilantin prescription while incarcerated at WCDC to ensure Nurse Baker was adequately informed. (*Id.*)

On the facts in this record, no reasonable jury could find that Nurse Hounshell recklessly failed to act reasonably to mitigate the risk posed by Mays' serious medical needs. Nurse Hounshell accurately documented Mays' condition and seizure history and flagged the prior Dilantin prescription for the provider, thereby performing the assessment and documentation functions of her role. (*Id.* at 9.) Although Nurse Hounshell was aware of Mays' medical history, she was not responsible for diagnosing or prescribing medication. (*Id.*) The responsibility for determining whether to order Dilantin rested with Nurse Baker, not her. (*Id.*) Within the confines of her role, she properly assessed and documented Mays' health conditions. Because the evidence does not support the finding of reckless disregard by Nurse Hounshell, her motion for summary judgment is **GRANTED** as to this claim.

### 3. Nurse Rojetta Bowling

Nurse Bowling was involved in two medical episodes involving Mays. On November 1, while passing medications, she observed Mays having a seizure-like episode that Mays later admitted to faking. Mays' Estate does not challenge her response to that event. (R. 60-1 at 15; R. 74 at 75.) Instead, Mays' Estate focuses on Nurse Bowling's efforts during the November 4 emergency, arguing that "the collective failures of LPN Bowling during the emergency response highlight an alarming disregard for critical nursing standards." (R. 74 at 76.)

There is evidence in the record indicating that Nurse Bowling's resuscitation efforts were flawed: she misplaced the AED pads, prolonged CPR while trying to take a pulse, and administered Narcan despite no clear indication of overdose. (*Id.*) While Mays' Estate does have a valid reason for criticizing Nurse Bowling's resuscitation attempts, the evidence clearly shows that Nurse Bowling took deliberate efforts to revive Mays. She did not ignore Mays' condition, delay in responding, or refuse to provide care; she responded promptly and tried, albeit imperfectly, to resuscitate her.

On these facts, no reasonable jury could conclude that Nurse Bowling recklessly failed to act reasonably to mitigate the risk posed by Mays' serious medical need. The record does not present evidence of the kind of conscious or reckless disregard for a known risk that the deliberate indifference standard requires. Because the evidence does not meet that threshold, Nurse Bowling's motion for summary judgment is **GRANTED** as to this claim.

### ii. Entity and individual Defendants sued in their official capacities

In addition to suing the Defendants in their individual capacities, Mays' Estate sued Whitley County, SHP, and all individual defendants in their official capacity. (*See* R. 1.) Against Whitley County and SHP, Mays' Estate asserts *respondeat superior* claims. (R. 1 at 23–24.)

27

42 U.S.C. § 1983 claims against municipalities are not cognizable based on a theory of *respondeat superior*. *See Griffith v. Franklin Cnty.*, 975 F.3d 554, 579 (6th Cir. 2020). Instead, a municipality can only be held responsible for constitutional violations if there is a direct causal link between a municipal policy or custom and the alleged deprivation. *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Deaton v. Montgomery Cnty., Ohio*, 989 F.2d 885, 889 (6th Cir. 1993). However, this standard is a "high bar[,]" and "[a] *Monell* claim that survives summary judgment is exceedingly rare." *Hanson v. Madison Cty. Det. Ctr.*, 736 F. App'x 521, 541-42 (6th Cir. 2018).

Similarly, the Sixth Circuit has held that the same analysis that applies to a § 1983 claim against a municipality also applies to a § 1983 claim against a private corporation, such as SHP. *See Street v. Corr. Corp. of Am.*, 102 F.3d 810, 818 (6th Cir. 1996) (citing *Monell*, 436 U.S. at 691) ("*Monell* involved a municipal corporation, but every circuit to consider the issue has extended the holding to private corporations as well."). This is because private companies performing traditional state functions such as providing medical care to inmates act under the color of state law. *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 736 (6th Cir. 2015).

Here, Mays can prove that the entity defendants are liable by showing "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Griffith*, 975 F.3d at 581 (citation and quotation marks omitted). The "policy or custom 'must be the moving force of the constitutional violation in order to establish the liability of a government body under § 1983.'" *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994) (quoting *Polk Cnty. v. Dodson*, 454 U.S. 312, 326 (1981)).

28

### a. Whitey County (Fiscal Court)

Mays' Estate argues that, because Whitley County owns, funds, and sets policy for the Jail, the County is responsible for the "comprehensive systemic failures" that led to Mays' death. (R. 74 at 39.) Mays' Estate specifically argues that Whitley County failed to train its employees in basic medical awareness and responding to medical emergencies. (*Id.*)

Mays' Estate attempts to substantiate its inadequate training claim by listing the Jail's "failed" inspections from 2017 to 2022. (*Id.* at 40.) The record reflects that citations were given for various reasons such as overcrowding, failure to provide medical training within 30 days of being hired, inadequate staff training, and hours-long lapses in inmate supervision. (*Id.* at 41–42.) According to Mays' Estate, the Fiscal Court knew of the failed inspections, yet did nothing to identify or correct the problems. (*Id.*) Lastly, Mays' Estate argues that the County's decision to staff onsite medical coverage to only 12 hours per day contributed to Mays' death. (*Id.* at 44.)

In response to these arguments, Whitley County points to KRS 441.025 and the case of *Regional Jail Authority v. Tackett,* 770 S.W. 2d 225 (Ky. 1989). (R. 85 at 3.) Both authorities make clear that a county's role in operating a jail is merely financial in nature, and that a jail's operation is within the jailer's authority. In fact, this Court has specifically stated that the Whitley County Fiscal Court has no oversight over the training standards for its jail. *See Poynter v. Whitley County Detention Center*, 722 F. Supp. 3d 745, 758 (E.D. Ky. 2024) ("First by statute, the Fiscal Court has no oversight over the training standards for county jails; that authority belongs to the Department of Corrections. *See* Ky. Rev. Stat. §§ 441.055(1) (a) (1) (d), 441.115 (1). The Fiscal Court prescribes rules governing proper jail operation, § 441.045 (1), but has no oversight over the daily operations of the jail; that authority belongs to the jailer.").

29

KRS 71.020 clearly states, "Each jailer shall have the custody, rule and charge of the jail in his county and all persons in the jail and shall keep the same by himself or by his deputy or deputies . . . ." The Whitley County Defendants correctly point out that the Department of Corrections is responsible for implementing minimum standards of medical care in jails. *See* 501 KAR 3:10.

The Whitley County Fiscal Court bears no responsibility for the Jail's daily management or operational decisions. Its role is limited to budgetary and administrative oversight rather than the supervision of jail personnel or the execution of correctional policies. Because of this separation of authority, Mays' Estate cannot establish that the Fiscal Court was involved in creating or maintaining any policy that resulted in inadequate training, deficient supervision, or a custom of tolerance toward violations of inmates' constitutional rights. In the absence of such evidence, the Fiscal Court cannot be held liable under a theory of municipal or supervisory liability.

Moreover, the record reflects that the Jail's medical staffing arrangement complied with all applicable statutory requirements. *See* 501 KAR 3:090. Specifically, the Jail maintained a contract with SHP providing 84 hours of medical coverage per week, structured as twelve-hour shifts each day of the week. This arrangement, jointly determined by the County and Jailer Lawson, was motivated by financial considerations. Mays' Estate offers no legal authority suggesting that an economically driven contracting decision, made in compliance with state law, amounts to deliberate indifference to inmates' medical needs. To hold otherwise would effectively impose liability on counties merely for operating within their budgetary constraints. Accordingly, summary judgment is **GRANTED** in favor of the Whitley County on this claim.

### b. Jailer Brian Lawson

Mays' Estate asserts that Jailer Lawson's decision to staff the jail with on-site medical personnel for only 12 hours per day constitutes a deliberate indifference to Mays' medical needs. It further challenges what it describes as an overly subjective protocol for handling medical emergencies, one that it claims, "fostered an environment where critical medical emergencies were systematically obstructed." (R. 74 at 49.)

Mays' Estate's allegations regarding the Jail's "failed" inspections are central to its claims here. The Whitley County Defendants argue that sanctions are not issued until there are repeated failures, and, in this case, none of the cited non-compliances resulted in sanctions. *See* KRS 441.075; R. 85 at 6. The Whitley County Defendants argue that all the non-compliances were corrected and that the evidence demonstrates Jailer Lawson's responsiveness in correcting the issues. (R. 85 at 7.) Upon review of the record, the Court finds that Jailer Lawson's conduct does not amount to a reckless disregard of Mays' medical needs with respect to ensuring proper training and supervision.

The record shows that, although there was a history of non-compliance, the deputies received training to recognize basic medical emergencies and to seek medical attention when necessary. (R. 85 at 7.) A lack of specialized overdose or drug-related training can, in some situations, give rise to municipal liability such as when officers themselves are primarily responsible for providing medical care. *See Helphenstine v. Lewis Cnty., Kentucky*, 60 F.4th 305, 324–25 (6th Cir. 2023). This is not the case here.

In cases like this one, where deputies are trained to identify medical issues and have access to professional medical providers, whom they did consult on numerous instances, the absence of more specific medical training has not been found to pose an obvious risk of constitutional violation. *See, e.g., Winkler v. Madison Cnty.*, 893 F.3d 877, 890 (6th Cir. 2018); *Berry v. Delaware Cnty. Sheriff's Off.*, 796 F. App'x 857, 862 (6th Cir. 2019). Holding

31

otherwise would contradict the established principle that officers may reasonably rely on the judgment of medical professionals. *Grote v. Kenton Cty.*, 85 F.4th 397, 416 (6th Cir. 2023).

Additionally, Mays has not offered any evidence showing that a failure to train was the "moving force" behind the alleged incident. *Polk Cnty. v. Dodson*, 454 U.S. 312, 326 (1981). It is insufficient to allege that an accident would have been avoided if an employee had more or better training. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). This is especially true where the medical evidence attributes the cause of death to "presumed cardiac dysrhythmia due to hypotonic dehydration associated with complications due to chronic drug abuse," a mechanism that turns on underlying physiology and chronic substance-use complications rather than on any discrete, observable overdose symptom that different training would necessarily have enabled deputies to treat. (R. 74 at 30.)

Mays has not presented sufficient evidence that the deputies' training was so deficient as to amount to a policy or custom that caused a constitutional violation. Even if the Court were to give substantial weight to the non-compliance reports, the issues identified fall short of demonstrating a pattern or practice of deliberate indifference rising to the level required for *Monell* liability. Accordingly, because Mays' Estate has not met the rigorous standard necessary to impose municipal liability under § 1983, Jailer Lawson's motion for summary judgment is **GRANTED** as to the constitutional claim.

### c. Southern Health Partners

Mays' Estate argues that the allegedly unconstitutional conduct "of the Southern Health employees should be imputed to Southern Health Partners, Inc." (R. 74 at 71.) However, Mays' Estate does not point to any policy or custom of SHP that resulted in her constitutional violation. Although a jury could find that Nurse Baker was deliberately indifferent by failing to verify Mays' Dilantin prescription, Mays' Estate does not link Nurse Baker's "clinical judgment" to a specific policy or custom of SHP. Because SHP can only be

32

liable for an official policy, custom, or practice, *not* just an employee's action, SHP is not liable as a matter of law. *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Accordingly, SHP's motion for summary judgment is **GRANTED** with respect to this claim.

### d. Official capacity suits against individual defendants

Mays' Estate named all individual defendants in both their official and individual capacities. (*See* R. 1.) The Defendants argue that the official capacity claims fail as a matter of law." Official-capacity suits . . . 'generally represent [ ] another way of pleading an action against an entity of which an officer is an agent.'" *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (quoting *Monell*, 436 U.S. at 691 n.55). When state officials are sued in their official capacities for monetary damages, they are not "persons" subject to suit within the meaning of § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Therefore, the Court **GRANTS** summary judgment in favor of Defendants Geroge, Bowman, Caldwell, Hughes, Cureton and Huddleston in their official capacities.

Moreover, the Complaint names the SHP nurses in their "official capacity as employees." (R. 1 at 3.) When private nurses are sued in their official capacities, courts interpret such claims as attempts to assert *respondeat superior* liability against the private contractor employing them. *See e.g.*, *Gray v. Jordan*, No. 5:21-cv-133-BJB, 2022 U.S. Dist. LEXIS 25846, at *3n.1 (W.D. Ky. Feb. 14, 2022); *Unthank v. Beavers*, No. 5:19-CV-P28, 2019 U.S. Dist. LEXIS 120700, at *4 (W.D. Ky. July 19, 2019); *Griffin v. S. Health Partners, Inc.*, No. 1:12CV-P174-M, 2013 U.S. Dist. LEXIS 17770, at *5 (W.D. Ky. Feb. 11, 2013). However, this theory is inapplicable here, as private medical providers serving county jails cannot be held liable under *respondeat superior* for a § 1983 claim. *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 818 (6th Cir. 1996); *Starcher v. Corr. Med. Sys., Inc.*, 7 F. App'x 459, 465 (6th Cir. 2001). Accordingly, the Court **GRANTS** summary judgment in favor of defendants Bowling, Hounshell, and Baker in their official capacities with respect to this claim.

### B. State Law Tort Claims and Immunity

In addition to the § 1983 deliberate indifference claim, Mays' Estate brought state law claims for negligence and gross negligence, wrongful death, outrage, and vicarious liability/*respondeat superior*. (*See* R. 1 at 22–24.) The Whitley County Defendants counter that their actions did not violate state law and thus they should be entitled to immunity. (R. 60-1 at 32.)

### i. Sovereign immunity

The Whitley County Defendants contend that "all Defendants" are entitled to sovereign immunity with respect to the pending state law claims. (R. 60-1 at 29.) Although SHP does not explicitly assert sovereign immunity, it is unclear whether the Whitley County Defendants' broad statement is intended to include SHP in that argument.

In Kentucky, counties are treated as political subdivisions of the state, which are entitled to sovereign immunity. *Jones v. Cross*, 260 S.W.3d 343, 345 (Ky. 2008) (citing *Lexington-Fayette Urban County Gov't v. Smolcic*, 142 S.W.3d 128 (Ky.2004)). Similarly, a county jailer sued in his official capacity is cloaked with sovereign immunity. *Commonwealth v. Harris*, 59 S.W.3d 896, 899 (Ky. 2001). SHP, however, is not entitled to immunity. *See Shadrick v. Hopkins Cty.*, 805 F.3d 724, 745 (6th Cir. 2015) ("we conclude that SHP is not entitled to share the county's governmental immunity.").

The Court finds that Whitley County and Jailer Brian Lawson in his official capacity are entitled to sovereign immunity, but SHP is not. Accordingly, Whitley County and Jailer Brian Lawson's motion for summary judgment is **GRANTED** on grounds of sovereign immunity with respect to all state law tort claims. To the extent that SHP claims sovereign immunity, its motion is **DENIED**.

### ii. Qualified immunity

Mays' Estate's primary argument is that qualified immunity does not protect the Whitley County Defendants from violating a person's constitutional rights. (R. 74 at 77, citing *Yanero v. Davis*, 65 S.W.3d 510, 521 (Ky, 2001)); *see Wilson v. Layne,* 526 U.S. 603, 609 (1999) (Qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.") (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, (1982)). While Mays' Estate is correct, the Court has already determined that the Whitley County Defendants did not violate Mays' constitutional rights. *Supra* § III.A. Accordingly, its argument fails on that basis.

Mays' Estate puts forth a secondary argument that qualified immunity does not protect the Whitley County Defendants from tort claims because their actions were ministerial. (*Id.* at 78.) The Defendants argue that qualified immunity shields them from being sued in their individual capacities. (R. 60-1 at 26, 32, 28.)

In Kentucky, when government officials are sued in their individual capacities, they are often granted qualified immunity. *Yanero*, 65 S.W.3d at 522. "Qualified official immunity applies to the negligent performance by a public officer or employee of (1) discretionary acts or functions . . . (2) in good faith; and (3) within the scope of the employee's authority." *Id.* at 522 (internal citations omitted).

Whether a government official is entitled to qualified immunity depends on whether the employee's act is discretionary or ministerial. *Marson v. Thomason,* 438 S.W.3d 292, 296 (Ky. 2014). If the act was purely ministerial, qualified immunity does not apply, and the defendant is subject to liability. *Id.* If the act is discretionary, then the burden shifts to the plaintiff to prove that the act was not done in good faith. *Yanero*, 65 S.W.3d at 522. Here, the

Parties dispute whether the Whitley County Defendants' actions were discretionary or ministerial.

Discretionary acts are "those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment." *Id.* at 522 (citing 63C Am. Jur. 2d § 322). [D]iscretionary acts or functions are those that necessarily require the exercise of reason in the adaptation of means to an end, and discretion in determining how or whether the act shall be done or the course pursued." *Haney v. Monskey,* 311 S.W.3d 235, 240 (Ky. 2010).

On the other hand, ministerial acts or functions are those that require "only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Yanero*, 65 S.W.3d at 522 (citing *Franklin County v. Malone*, 957 S.W.2d 195, 201, (Ky. 1997)).

The Parties dispute whether the actions of all Defendants were ministerial or discretionary in nature. Both sides make broad conclusory statements. (*Compare* R. 60-1 at 32; *with* R. 74 at 78.) Notwithstanding the Parties' superficial and conclusory arguments, the Defendants' actions are not as easily classifiable as either side suggests. This is because classifying an act or function as discretionary or ministerial is an inherently fact-intensive inquiry necessitating a "probing analysis[.]" *Haney*, 311 S.W.3d at 240. The decision requires thorough analysis because "few acts are ever purely discretionary or purely ministerial." *Id*. Ultimately, the classification of ministerial or discretionary depends on "the dominant nature of the act" or function in question. *Id*.

Mays' Estate argues that Jailer Lawson and the WCDC deputy jailers are not entitled to qualified immunity because they "possessed an unequivocal duty to follow the Kentucky Jail Standards and their own established policies and procedures to protect Terri Beth Mays and ensure she received necessary medical care." (R. 74 at 78.) Mays' Estate further argues

that given the clear mandates within these regulations and policies, providing medical care to Mays in this case was a ministerial, not a discretionary act. (*Id.*) Because the Jail's policies are critical for determining whether the deputies' acts were discretionary or ministerial, they are laid out in detail below.

### a. Jail Policies

Whitley County, Kentucky is statutorily responsible for attending to the medical needs of the inmates of the Jail. *See* KRS 71.040, 441.025; 501 KAR 3:090. The Jail's inmates are entitled to receive the same quality of care for their medical needs as those in the local community. *Id.* 501 KAR 3:090 requires 24-hour emergency medical services for inmates, stocked first-aid kits, and a structured Medical Emergency Care Plan. The Whitley County Detention Center Policy and Procedures ("Policy and Procedures") mirror the administrative regulations, detailing similar protocols for a range of emergencies, including: withdrawals and seizures, notification procedures, and steps for emergency intervention, such as calling EMS and transporting inmates to a local hospital. (R. 74 at 2.)

The WCDC policy regarding surveillance depends on the inmate's condition. Regular surveillance is required at least once every hour on an irregular schedule, by conducting a visual inspection of each cell area. (R. 74-1 at 2.) This policy requires female deputies to supervise female inmates. (*Id.*)

Importantly, § VI-100 of the Policy and Procedures establishes the standard for special surveillance observation. It requires Jail personnel to conduct and document direct in-person surveillance a minimum of every twenty (20) minutes on inmates "in detoxification areas." (*Id.*) This mirrors 501 KAR 3:090 Section 2(2).

The observation requirements under the Policy and Procedures require deputies to "observe inmate's behavior and appearance for unusual or questionable situations and event (e.g., bruises or cuts on an inmates face arms, an inmate expressing hostility, showing signs

37

of depression, not eating, not talking to other inmates, or and [*sic*] inmate not in his/her proper cell if inappropriate for that individual.)" (*Id.*) The Policy and Procedures also require deputies to note "any and all significant or unusual events occurring during the shift" in their daily log. (*Id.*)

The WCDC Policy and Procedures for medical emergencies follow the standard set in 501 KAR 3:090 Section 1(12). This policy establishes the level of emergency medical care for inmates. The policy section states:

> Emergency medical services are available 24 hours a day to inmates of the Whitley County Jail to ensure prompt emergency medical attention. All officers are trained to respond to medical emergencies since an inmate's life may depend on appropriate first aid, emergency medical, dental, and psychiatric care shall be available to all inmates commensurate with the level of such care available to the community.

(R. 74 at 3.)

The Policy and Procedures then state the procedure for defining and responding to an emergency. There are ten categories of events constituting an emergency, any of which, if present, initiate the "Medical Emergency Care Plan." (*Id.*) Notably, "drug or alcohol withdrawal" and "unconsciousness or seizure" are two of the listed categories that meet the definition of an emergency. (*Id.*) Therefore, under the WCDC Policy and Procedures, if an inmate is seizing, unconscious, or undergoing withdrawal, the Medical Emergency Care Plan is initiated.

The Medical Emergency Care Plan states as follows: "1. Be aware that an emergency can occur at any time. 2. Be ready to observe or be notified of the emergency. 3. First aid must be given immediately. 4. Telephone the facility physician for instructions. 5. Call for assistance from other detention officers, if needed." (*Id.* at 4.)

38

### b. Ministerial or discretionary duty

### 1. Jailer Brian Lawson

Mays' Estate's claims against Jailer Lawson allege that he breached his duty to prevent harm against detainees through his promulgation, enforcement, and oversight of inmate medical care and supervision. (R. 74 at 48.)

It is a close question whether Jailer Lawson's duty to train staff and enforce WCDC Policy and Procedures is ministerial or discretionary. In *Hedgepath v. Pelphrey*, 520 F. App'x 385 (6th Cir. 2013) the Sixth Circuit reviewed a case involving a drug overdose while in custody. The Sixth Circuit ruled, based on "well-settled" Kentucky law, that although a supervisor's decision "on the content of policies and training is a discretionary function, the training of employees to adhere to their duties once that content is decided is a ministerial function." *Id*. at 391. The court further held, "the supervision of employees is a ministerial act when it merely involved enforcing known policies." *Id*. The court affirmed the denial of qualified official immunity to the supervisory jailers on the claims that they failed to train deputy jailers on the jail policy and failed to enforce the policy. The Court's reasoning was adopted in a factually similar case, *Finn v. Warren Cty*., 768 F.3d 441, 450 (6th Cir. 2014). The Sixth Circuit agreed with the outcome in *Hedgepath* and determined that the jailer's duty to train deputies and ensure they follow written policy is a ministerial duty. *Id*. at 450.

In this case, Mays' Estate criticizes Jailer Lawson's enforcement of the Policy and Procedures. The procedures at issue detail "protocols for a range of emergencies, including: withdrawal, seizures, and other health conditions; and, notification procedures, and steps for emergency intervention, such as calling EMS and transporting inmates to a local hospital." (R. 74 at 2.) These policies were intended to prevent reasonably anticipable harms from seizures, withdrawals, and overdoses. Specifically, the Policy and Procedures VI-100 (3)

39

required "in-person surveillance a minimum of every twenty (20) minutes on the following classes of inmates; . . . f. inmates in detoxification areas." (R. 74-1.)

The facts, viewed in Mays' Estate's favor, reveal a stark gap between the written Policy and Procedures and the deputies' purported understanding of them. (*See e.g.,* R. 83 at 2–11.) On these facts, Jailer Lawson appears to have a ministerial duty. Accordingly, the Court denies qualified immunity to Jailer Lawson at this stage but reserves the right to reconsider after the presentation of evidence at trial.

### 2. WCDC Deputy Jailers

The record reflects that on November 2 the deputies responded to cell 204 due to inmates banging and yelling that Mays was "laying on the floor, seizing out." (R. 74 at 16.) Deputy Geroge was point in assisting Mays to special observation cell 205 and wrote the incident report. (*Id.*) The record also reflects that Deputy George did not report the incident to medical staff. (*Id.* at 62.) On November 4, Deputy George found Mays unresponsive in her cell and rendered aid. In these situations, Deputy George appears to have a ministerial duty. (*See* Policy and Procedures R. 74 at 3.)

Deputy Bowman was working the night before and morning of Mays' death. Construing the facts in the favor of Mays' Estate, Mays' stay in detox cell 205 required 20-minute check-ins. (*See* R. 74 at 22.) As the female deputy on shift that night, it was Deputy Bowman's job to conduct the checks. This responsibility also appears to be a ministerial duty.

Deputies Hughes and Huddleston responded to Mays' medical incident on November 2. Whether their actions constituted a ministerial or discretionary duty is a close question, and the record at this stage does not permit a conclusive determination. Construing the duty as ministerial for purposes of this analysis, the Court will evaluate the negligence claims against Deputies Hughes and Huddleston.

40

Sergeant Caldwell was the "Officer in charge" on November 2, and Sergeant Cureton was the "Supervisor" on November 4. (*Id.* at 64, 26.) On the evidence in the record, it appears that Sergeants Caldwell and Cureton's obligation to notify appropriate medical personnel could be viewed as a ministerial duty.

Accordingly, the Court declines to grant qualified immunity to Jailer Lawson, Deputies George, Bowman, Hughes, and Huddleston, and Sergeants Caldwell and Cureton at this time. The Court reserves its right to grant qualified immunity to any of the above-named defendants after the evidence is presented at trial.

### 3. SHP defendants

The SHP Defendants are not entitled to qualified immunity. It is well settled in the Sixth Circuit that nurses employed by a private company do not enjoy qualified immunity. *Howell v. NaphCare, Inc.*, 67 F.4th 302, 317 n.4 (6th Cir. 2023) ("[n]urses employed by a private medical provider . . . are not entitled to assert qualified immunity."). Accordingly, to the extent that the SHP Defendants seek qualified immunity, their motion for summary judgment on that basis is **DENIED**.

### iii. Negligence

Mays' Estate brings negligence and gross negligence claims. (R. 1.) It argues that "the Defendants' systematic and pervasive failures to screen properly, monitor diligently, and provide Mrs. Mays with necessary medical care, despite their clear and documented knowledge of her severe medical vulnerabilities, constitutes a profound breach of their statutory duties." (R. 74 at 78–79.) Specifically, Mays' Estate argues that Defendants' actions were a "direct and substantial factor in causing her tragic and preventable death." (*Id.*) The Defendants argue that Mays' Estate cannot prove causation. (R. 60-1 at 34; 79 at 4.)

Under Kentucky law, to establish a negligence claim, a Plaintiff must show: (1) the Defendant owed the Plaintiff a duty; (2) the Defendant breached that duty; and (3) the

41

Defendant's breach caused the Plaintiff's injury. See *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 88 (Ky. 2003). Failure to establish any of these elements is fatal to Plaintiff's claim. *M & T Chems., Inc. v. Westrick*, 525 S.W.2d 740, 741 (Ky. 1974).

Furthermore, causation for any injury consists of two parts: actual causation and legal causation. See *Lewis v. B & R Corp.,* 56 S.W.3d 432, 437 (Ky. Ct. App. 2001). To prove actual causation, a plaintiff must show the defendant's conduct was a "substantial factor" in bringing about the plaintiff's injury. *Id.* As for legal causation, a plaintiff must show a claimed injury was a "natural and probable" consequence of the defendant's conduct. *Spivey v. Sheeler*, 514 S.W.2d 667, 672 (Ky. 1974).

In addition to the common law duty, Kentucky law imposes specific duties on a county jailer:

> At the time of booking, the jailer shall receive and keep in the jail all persons who are lawfully committed thereto, until they are lawfully discharged, unless the person is in need of emergency medical attention, in which case the arresting officer shall obtain medical attention for the person prior to delivery to the jail. The jailer shall treat them humanely and furnish them with proper food and lodging during their confinement. He shall deliver those who die in jail to their friends, if requested, or have them decently buried at the expense of the county.

Ky. Rev. Stat. § 71.040. This statue has been interpreted by Kentucky courts to impose a "duty to exercise reasonable and ordinary care and diligence to prevent unlawful injury to a prisoner placed in his custody, but he cannot be charged with negligence in failing to prevent what he could not reasonably anticipate." *Rowan County v. Sloas*, 201 S.W.3d 469, 479 (Ky. 2006); *Lamb v. Clark*, 138 S.W.2d 350, 352 (Ky. 1940) (citing *Ratliff v. Stanley,* 7 S.W.2d 230, 231 (Ky. 1928)). Because there is a "special relationship" between jailers and inmates, the deputies had a duty to protect Mays from foreseeable harm. *See Fryman v. Harrison*, 896 S.W.2d 908, 909-10 (Ky. 1995).

### a. Jailer Lawson

Mays' Estate argues that Jailer Lawson breached his duty to prevent harm against detainees through his promulgation, enforcement, and oversight of inmate medical care and supervision. (R. 74 at 48.)

The record reflects that Jailer Lawson ensured that the deputies received the number of hours of training required by the Department of Corrections, were trained in CPR, first aid, and mental health awareness. (R. 60-1 at 8.) Jailer Lawson agreed that the detox cell required twenty-minute checks during their first 24 hours. (*Id.*) Testimony from many of the deputies reveals discrepancies about the status and surveillance requirements for cell 205 and their response to inmate medical emergencies. (*Compare* R. 74 at 22 *with* R. 83 at 2–3.)

On these facts, a reasonable jury could find that Jailer Lawson's enforcement and oversight of the specific policies were negligent. A jury could find that had Jailer Lawson dedicated more effort ensuring strict compliance of the provider notification and 20-minute check-in requirements, Mays' death would not have resulted. Accordingly, Jailer Lawson's motion for summary judgment is **DENIED** as to this claim.

### b. Deputy Jailers Bowman, George, Caldwell and Cureton

There is sufficient evidence in the record to create a genuine issue of material fact as to whether Deputy Bowman and Deputy George acted negligently. A reasonable jury could find that Deputy Bowman's failure to conduct 20-minute checks was a substantial factor in Mays' death and that the harm was a foreseeable. A jury could also determine that more frequent observation may have led to an earlier recognition of Mays' condition and timely medical intervention. Similarly, a reasonable jury could conclude the same about that the actions and inactions of Deputy George, Sergeant Caldwell, and Sergeant Cureton on November 2 and 4. Given the evidence concerning their responses to Mays' medical condition and the alleged failure to notify medical personnel, summary judgment must be denied.

43

At this stage, it is difficult for the Court to make a conclusive determination of negligence for any of these defendants. The issue of their liability is properly reserved for the jury. Accordingly, the motion for summary judgment filed by Deputy Jailers Bowman, George, Caldwell, and Cureton is **DENIED** as to this claim.

### c. Deputies Hughes and Huddleston

The only involvement that Deputies Hughes and Huddleston had with Mays was their response to Mays' medical incident in cell 204 on November 2. Mays' Estate provides no evidence that these two deputies' actions caused Mays death. Given what little evidence exists in the record regarding Deputies Hughes and Huddleston's actions, no reasonable jury could find them negligent. Accordingly, Deputies Hughes and Huddleston's motion for summary judgment is **GRANTED** with respect to this claim.

### d. SHP Nurses Hounshell

The record indicates that Nurse Hounshell's primary interaction with Mays was on October 30 when she conducted the medical intake. (R. 74 at 71.) Mays' Estate takes issue with Nurse Hounshell's decision to place Mays in general population housing, calling it "reckless." (*Id.* at 9.) Nurse Hounshell's limited responsibility was to assess Mays, take her vitals, and document them in the medical record. (*Id.* at 71.) The record reflects that Nurse Hounshell completed her duties, and even investigated Mays' past medical record to find that she was previously prescribed Dilantin. (*Id.* at 10.) Nurse Hounshell noted this for Nurse Baker. (*Id.*) Nurse Hounshell did not interact with Mays after that. (*Id.*)

On these facts, Mays' Estate cannot prove breach or causation. No reasonable jury could find that within Nurse Hounshell's limited role, she failed to act reasonably. When Nurse Hounshell evaluated Mays, she documented balance issues, dizziness, blackouts, headaches, and vomiting. (*Id.* at 9.) She also documented that Mays appeared to be under the influence of, or withdrawing from, drugs or alcohol. (*Id.* at 10.) Based off this information,

44

initially placing Mays on a drug detox protocol and withdrawal monitoring was reasonable given Mays' symptoms. At the time of the October 30 intake, Nurse Hounshell observed obvious withdrawal symptoms and acted accordingly. If the Court finds breach for not initially placing Mays in a special observation cell, it would create an unreasonable burden to place every inmate exhibiting withdrawal symptoms in an individual cell. This is not mandated by the Policy and Procedures or by law.

Similarly, even if breach could be found, there is no evidence that Nurse Hounshell's actions were the cause of Mays' death. No reasonable jury could find that had Nurse Hounshell ordered Mays to be placed in a detox cell on October 30 she would not have died on November 4. For these reasons, Nurse Hounshell's motion for summary judgment is **GRANTED** with respect to this claim.

Mays' Estate alleges that Nurse Bowling's efforts to save Mays on the morning of November 4 constituted a "systemic breach of emergency protocols." (R. 74 at 76.) In response, the SHP defendants argue that there was nothing that Nurse Bowling did nor did not do during her resuscitative efforts that would have prevented her death. (R. 79 at 3.) The SHP defendants argue that Mays' Estate's expert (1) did not dispute the cause of death, and (2) conceded that Ms. Bowling's CPR and AED efforts would not have changed the outcome, as Mays' breathing was below the threshold for sustaining life for 20 minutes before nurse Bowling got there. (*Id.*)

Notwithstanding the notable issues with Nurse Bowling's resuscitative efforts, Mays' Estate presented insufficient evidence that Nurse Bowling's conduct caused Mays' death. The evidence shows that Mays suffered a large-scale medical episode at 7:04 a.m. and was rendered un-revivable sometime around 7:18 a.m. (R. 74 at 28; R. 79 at 3.) It was not until 7:38 that Nurse Bowling got to the cell. (R. 74 at 13.) Because the evidence establishes that, through no fault of her own, Nurse Bowling's life-saving efforts came too late, no reasonable

jury could conclude that she caused Mays' death. Accordingly, Nurse Bowling's motion for summary judgment is **GRANTED** with respect to this claim.

As to Nurse Baker, however, the record reveals a different story. Regardless of which underlying condition was to blame for Mays' death, the question is whether Nurse Baker's failure to prescribe Dilantin despite her knowledge of Mays' current medical condition, history of seizures, and past Dilantin prescriptions was the most direct cause of Mays' death. The Court cannot conclude at the summary judgment stage whether Mays still would have passed away even if she was prescribed an anti-epileptic medication upon admission to the Jail. Viewing the evidence in the light most favorable to Mays' Estate, there is a question of fact regarding causation, and the negligence claim survives. Accordingly, Nurse Baker's motion for summary is **DENIED** as to this claim.

### e. SHP

Count VI of the Complaint alleges vicarious liability and *respondeat superior* against SHP for all claims. (R. 1 at 22.) An employer may be held vicariously liable when "the employee's actions were in the course and scope of his employment and in furtherance of the employer's business." *Easterling v. Man-O-War Automotive, Inc.*, 223 S.W.3d 852, 855 (Ky. App. 2007).

Nurse Baker was acting in the scope of her employment when she declined to prescribe Dilantin to Mays. Her job was "making diagnoses, formulating a treatment plan, and prescribing medications. (R. 74 at 9.) Necessarily, not prescribing Dilantin falls squarely within these roles. Because the negligence claim against her still stands, the vicarious liability claim against SHP must remain. Accordingly, SHP's motion for summary judgment is **DENIED** with respect to this claim.

46

### iv. Gross negligence

Count II of the Complaint also asserts a claim for gross negligence against all Defendants. (R. 1 at 22.) Gross negligence is a heightened level of negligence defined as a "conscious and voluntary act or omission which is likely to result in grave injury when in face of clear and present danger of which alleged tortfeasor is aware" or failure to exercise slight care. *Sparks v. Re/Max Allstar Realty, Inc.*, 55 S.W.3d 343, 348 (Ky. App. 2000). There must be an element either of malice or willfulness or such an utter and wanton disregard of the rights of others as from which it may be assumed the act was malicious or willful." *Phelps v. Louisville Water Co.*, 103 S.W.3d 46, 51-52 (Ky. 2003).

#### a.  Nurse Baker and SHP

The Court previously stated that a reasonable jury could find Nurse Baker's conduct "grossly inadequate," and, thus, amounting to both deliberate indifference and negligence. For those same reasons, a reasonably jury could also conclude that Nurse Baker's failure to investigate Mays' current prescriptions was likely to produce a grave result. *Sparks,* 55 S.W.3d at 348. For this reason, Nurse Baker's motion is **DENIED** as to this claim. SHP's motion for summary judgment is **DENIED** on this claim pursuant to *respondeat superior*.

#### b.  Jailer Lawson and WCDC Deputy Jailers

A reasonable jury could not, however, find that Jailer Lawson's conduct amounts to malice, willfulness, or wanton disregard of Mays' rights. There is no evidence suggesting that Lawson maliciously or willfully chose to insufficiently train his deputies or enforce the Policy and Procedures.

As to Deputy Jailers Bowman, George, Caldwell, and Cureton, Mays' Estate presents insufficient evidence their conduct was the result of willful or malicious behavior. Accordingly, Jailer Lawson and the WCDC Deputy Jailers' motion is **GRANTED** with respect to this claim.

47

### c. All other Defendants

As to all other Defendants, they have been granted immunity or determined not negligent. Necessarily, the gross negligence claim as to all other Defendants fails as a matter of law. Their motion for summary judgment is therefore **GRANTED**.

### v. Outrage

Mays Estate alleges that all Defendants are liable for the common law tort of outrage. In Kentucky, this tort is also known as intentional infliction of emotional distress ("IIED"). *See Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 788 (Ky. 2004). Kentucky considers the tort of outrage to be a "gap-filler." *Rigazio v. Archdiocese of Louisville*, 853 S.W.2d 295, 298–99 (Ky. Ct. App. 1993). Thus, a claim of outrage is not a valid cause of action in Kentucky where the alleged conduct makes out a claim for another tort for which emotional distress damages are available. *Id*. The result is the general rule that an IIED or outrage claim cannot be pled by itself, in tandem with another tort, or in the alternative as long as some other tort with adequate relief fits the facts. *See Carter v. Porter*, 2008 WL 4911142, at \*5 (E.D. Ky. 2008) (dismissing IIED claim on 12(b)(6) motion because malicious prosecution claim would potentially allow damages for emotional distress). The sole exception to this general rule is where the alleged "actions or conduct are intended only to cause extreme emotional distress in the victim." *Brewer v. Hillard*, 15 S.W.3d 1, 8 (Ky. Ct. App. 2000).

In this case, Mays' Estate alleges claims of deliberate indifference to a serious medical need as well as negligence and gross negligence. Because emotional distress damages are available for each of those claims, the outrage claim is inappropriate unless it can produce evidence that the Defendants took the above actions "only to cause [Mays] extreme emotional distress[.]" *Banks v. Fritsch*, 39 S.W.3d 474, 481 (Ky. Ct. App. 2001). Mays' Estate has not produced sufficient evidence of extreme emotional distress. Accordingly, the Defendants' motions for summary judgment are **GRANTED** as to this claim.

### vi. Punitive damages

"Punitive damages is not a standalone claim in Kentucky." *Correll v. Mut. of Omaha Ins. Co.*, No. 6:19-CV-97-REW-HAI, 2023 U.S. Dist. LEXIS 187028, 2023 WL 6880385, at *7 n. 12 (E.D. Ky. Oct. 18, 2023). Instead, a punitive damages claim is merely a "a remedy potentially available for another cause of action." *Petrey v. Ethicon, Inc.*, Civil Action No. 5:19-298-DCR, 2019 U.S. Dist. LEXIS 180314, 2019 WL 5295185, at *3 (E.D. Ky. Oct. 18, 2019) (citation and quotation marks omitted); *Ammon v. Welty*, 113 S.W.3d 185, 188 (Ky. Ct. App. 2002) (explaining that punitive damages are only available when claims are asserted on which actual damages can be awarded). Accordingly, Mays' Estate's stand-alone punitive damages claim is **DISMISSED**.

### vii. Wrongful Death

A plaintiff who fails to address a claim in response to a motion for summary judgment abandons the claim. *See Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment."); *Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011) (holding that "[t]he district court properly declined to consider the merits of [the plaintiff's hostile work environment claim] because [the plaintiff] failed to address it in . . . his response to the summary judgment motion").

Here, Mays' Estate brought a wrongful death action in Count III of its Complaint. (R. 1 at 22.) Only one of the Defendants' motions for summary judgment referenced the wrongful death claim, and Mays' Estate failed to address that claim in its response. (*See* R. 39-1 at.) Because these facts demonstrate abandonment, the wrongful death claim is **DISMISSED**.

**C. Claims Against Unknown Defendants**

In its Complaint Mays' Estate lists "unknown individual defendants 1–3; and unknown entity defendants 1–3." (*See* R. 1.)

Generally, "[i]f a defendant is not served within 90 days after the complaint is filed, the court . . . must dismiss the action without prejudice against that defendant." Fed. R. Civ. P. 4(m). "Courts have made an exception to this rule for cases involving unknown . . . defendants when discovery will make known the unavailable identity of the defendant." *Strunk v. Liberty Ins. Corp.*, Case No. 5:18-cv-288-JMH, 2019 U.S. Dist. LEXIS 26768, 2019 WL 724430, at *2 (E.D. Ky. Feb. 20, 2019). Even if that exception applies, the plaintiff must still substitute a named defendant for the unknown defendant after discovery has closed or else the Court will dismiss the unknown defendant. *See id.*

The deadline to complete discovery and to amend has long passed, *see* R. 38, and Mays' Estate did not move to substitute named defendants for the unknown ones. Therefore, all claims against unknown individual defendants 1–3 and the unknown entity defendants 1–3 are **DISMISSED**.

## IV. CONCLUSION

For the aforementioned reasons, the Court hereby **ORDERS** as follows:

1) The Motion for Summary Judgment (R. 60) of Defendants Whitley County, Jailer Brian Lawson, Sergeants Austin Caldwell and Joseph Cureton, and Deputies Zach Hughes and Nick Huddleston is **GRANTED in part** and **DENIED in part**.

   a) As to Defendants Whitley County, Hughes, and Huddleston, their motion (R. 60) is **GRANTED in full**.

   b) As to Defendant Jailer Lawson, his motion (R. 60) is **DENIED** as to the negligence claim. Jailer Lawson's motion (R. 60) is **GRANTED** as to all other claims.

50

c) As to Defendant Sergeant Caldwell, his motion (R. 60) is **DENIED** as to the negligence claim. Sergeant Calwell's motion (R. 60) is **GRANTED** as to all other claims.

d) As to Defendant Sergeant Cureton, his motion (R. 60) is **DENIED** as to the negligence claim. Sergeant Cureton's motion (R. 60) is **GRANTED** as to all other claims.

2) The Motion for Summary Judgment (R. 56) of Deputies Sula Bowman and Kaytee George is **GRANTED in part** and **DENIED in part**.

a) As to Defendant Deputy Bowman, her motion (R. 56) is **DENIED** as to the negligence claim. Deputy Bowman's motion (R. 56) is **GRANTED** as to all other claims.

b) As to Defendant Deputy George, her motion (R. 56) is **DENIED** as to the negligence claim. Deputy George's motion (R. 56) is **GRANTED** as to all other claims.

3) The Motion for Summary Judgment (R. 39) for the SHP Defendants is **GRANTED in part** and **DENIED in part**.

a) As to Defendant Nurses Tammi Hounshell and Rojetta Bowling, their motion (R. 39) is **GRANTED in full**.

b) As to Defendant Nurse Karen Bennett-Baker, her motion (R. 39) is **DENIED** as to the Fourteenth Amendment deliberate indifference claim brought under 42 U.S.C. § 1983 and the negligence and gross negligence claims. Nurse Baker's motion (R. 39) is **GRANTED** as to all other claims.

c) As to Defendant SHP, its motion (R. 39) is **DENIED** as to the vicarious liability/*respondeat superior* claim. Its motion (R. 39) is **GRANTED** as to all other claims.

As a result of this Opinion, the remaining claims in this action are as follows: deliberate indifference under 42 U.S.C. § 1983, negligence, and gross negligence against Nurse Bennett-Baker; vicarious liability/*respondeat superior* against SHP; and negligence against Jailer Lawson, Deputy Jailers Bowman, George, Caldwell, and Cureton.

This 21st day of April, 2026.

Signed By:

*Karen K. Caldwell*

United States District Judge